**SO ORDERED.**

**SIGNED this 24th day of January, 2020.**



BENJAMIN A. KAHN
UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| EVEX ROSS FRANKLIN, | ) | Case No. 19-80661 |
| | ) | |
| Debtor. | ) | |
| | ) | Chapter 13 |

### MEMORANDUM OPINION AWARDING DAMAGES, ALLOWING COMPENSATION, AND IMPOSING SANCTIONS AGAINST FIELD'S MANAGEMENT, INC.

This case is before the Court on Debtor's Complaint for Violation of the Automatic Stay and Sanctions (the "Sanctions Motion"), ECF No. 10, against Creditor Field's Management, Inc. ("Fields") and the Affidavit and Application for Attorney Fees in Connection with Action Filed Against Field's Management, Inc. (the "Fee Application"). ECF No. 16. On November 13, 2019, the Court conducted an evidentiary hearing on the Sanctions Motion (the "Evidentiary Hearing"), at which Brandi Leigh Richardson appeared on behalf of Debtor Evex Ross Franklin ("Debtor's Counsel"), Chris A. Kremer appeared on behalf of Fields ("Creditor's Counsel"), and

1

Benjamin Lovell appeared on behalf of the Trustee Richard M. Hutson, II. ECF No. 18. After hearing the testimony and arguments of counsel, the Court took the matter under advisement. The Fee Application similarly came before the Court for hearing on December 19, 2019, and the Court also took that matter under advisement. ECF No. 27. For the reasons set forth below, the Sanctions Motion will be granted and the Fee Application will be approved as filed.

## JURISDICTION AND AUTHORITY

The Court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. § 1334. Under 28 U.S.C. § 157(a), the United States District Court for the Middle District of North Carolina has referred this case and this proceeding to this Court by its Local Rule 83.11. This is a statutorily core proceeding under 28 U.S.C. § 157(b)(1) and (2)(G). The Court has constitutional authority to enter final judgments in this proceeding.[1]

## PROCEDURAL HISTORY

The Debtor commenced her bankruptcy case by filing a voluntary chapter 13 bankruptcy petition on September 4, 2019 (the "Petition"). ECF No. 1. That same day, Debtor also filed a proposed chapter 13 plan. ECF No. 2. Debtor listed Fields as a

---

[1] The claims in this case are constitutionally core, <u>Budget Serv. Co. v. Better Homes of Va., Inc.</u>, 804 F.2d 289, 292 (4th Cir. 1986), and the parties have consented to this Court entering final judgments. ECF Nos. 10 and 13, Attachment 16.

secured creditor in Schedule D, ECF No. 1, and she included Fields on her mailing matrix with the following address: Field's Management, Inc., Attn: Officer, 335 Fields Drive, Aberdeen, NC 28315. Id. at 52. Debtor's plan proposed to retain her 2007 Mitsubishi Outlander (the "Vehicle"), which secures Fields' claim, by making payments to Fields in the amount of $99.00 per month, along with 7.25% interest, until Debtor paid the allowed secured claim in full. ECF No. 2. Additionally, the plan provides that Debtor will pay Fields five adequate protection payments in the amount of $48.00. Id. The certificate of service attached to the proposed plan provides that Fields was served with a copy of the proposed plan.[2] Id. at 6. The Bankruptcy Noticing Center ("BNC") mailed the Notice of the Chapter 13 Bankruptcy Case to Fields at the 335 Fields Drive address on September 5, 2019.[3] ECF Nos. 6 and 9.

---

[2] Debtor asked the Court to take judicial notice of ECF No. 2, which evidences that Debtor served the Proposed Plan via first class mail to Fields at the following address:

Field's Management, Inc.
Attn: Officer
335 Fields Drive
Aberdeen, NC 28315

On September 12, 2019, Fields sent Debtor a letter indicating that Fields had possession of the Vehicle and planned to sell it. The address listed at the top of the letter, in addition to the address listed in Fields' Proof of Claim, corresponds with the address listed for Fields on the certificate of service attached to the proposed plan.

[3] The Certificate of Notice filed by the BNC on September 7, 2019 indicated that the notice was served on Fields at the 335 Fields Drive address.

Debtor filed a complaint initiating an adversary proceeding on September 16, 2019. ECF No. 10. Debtor alleges that Fields willfully violated the automatic stay by activating a kill switch and repossessing the Vehicle post-petition. Id. The Complaint set forth two claims for relief. Id. In her first claim for relief, Debtor requested turnover of the Vehicle. In the second claim for relief, she requested that the Court sanction Fields under 11 U.S.C. § 362(k) for the alleged violations of the automatic stay, with such sanctions to include actual damages and expenses, attorney's fees, and punitive damages, including but not limited to, monetary damages or a reduction or cancellation of Fields' lien on the Vehicle. Id. ¶¶ 41 and 42.

On September 18, 2019, the Debtor filed the Emergency Motion in the adversary proceeding, requesting an order requiring Fields to surrender the Vehicle and not sell or otherwise dispose of the Vehicle. ECF No. 13-4. The Court held a hearing on the Emergency Motion and granted Debtor's Emergency Motion and ordered Fields to return the Vehicle to Debtor on or before October 4, 2019. ECF No. 13-13. Thereafter, the Court entered the Interim Order effectuating its ruling and directing Fields to return the Vehicle to Debtor. ECF No. 13-11. In addition, the Interim Order scheduled the Evidentiary Hearing consistent with Bankruptcy Rule 9014(e) for Tuesday, October 22, 2019, to consider whether to award

actual damages, punitive damages, and attorney's fees. Id. p. 2, ¶ 4.

Fields complied and timely returned the Vehicle to Debtor. On October 15, 2019, Fields moved to continue the Evidentiary Hearing scheduled for October 22, 2019. ECF No. 13-14. That same day, Debtor responded in opposition to the requested continuance. ECF No. 13-15. On October 17, 2019, Fields filed its Answer to the Complaint, asserting a counterclaim for common law fraud arising out of Debtor's pre-petition purchase of the Vehicle. ECF No. 13-16. The relief requested in the counterclaim is limited to actual and punitive damages, and the costs of the action, including attorney's fees.

On October 18, 2019, the Court bifurcated the Debtor's remaining claim and Fields counterclaim, and converted the Debtor's remaining claim to a contested matter. ECF No. 12. As a result, the Court rescheduled the Evidentiary Hearing for November 13, 2019.[4] In its Order, the Court gave notice that it would

---

[4] The Court bifurcated the proceeding between the relief sought by Debtor for violation of the automatic stay, which is resolved as a contested matter, and the monetary claim asserted by Creditor, which will be resolved in the claims adjudication process. Fields did not seek any relief in its Counterclaim beyond monetary relief, and did not assert that any alleged debt should be excepted from Debtor's discharge. Thereafter, Fields did not timely file an adversary proceeding seeking to except its debt from the Debtor's discharge prior to the December 17, 2020 deadline under Fed. R. Bankr. Pro. 4007(c). On January 22, over a month after the deadline to file such a complaint, Fields filed its objection to confirmation, contending for the first time that any debt owed to Fields should be excepted from Debtor's discharge. Such a contention is procedurally improper and untimely. As reflected in the Court's prior orders and on the record in this case, the Court advised Creditor's Counsel on three occasions prior to the deadline to commence an action seeking to except its

consider at the Evidentiary Hearing whether to award the relief requested by Debtor in her second claim for relief under the Complaint, including punitive damages. Id. at 6-7. The Court ordered Fields to amend its informal proof of claim within thirty days by properly completing and filing an amended claim on Official Form 410. Fields complied and filed its original Proof of Claim on October 18, 2019.[5] See Claim No. 3. At the Evidentiary Hearing, Debtor testified and offered the testimony of Lisa Talley, legal assistant to Debtor's Counsel, and Frances Bumgarner, legal assistant to the Trustee. After the Evidentiary Hearing,[6] Debtor's Counsel submitted an affidavit for attorney's fees ("Application for Compensation") incurred in connection with the action filed against Fields.[7] ECF No. 16. The Court heard the arguments of

---

debt from discharge to associate bankruptcy counsel—advice counsel has yet to heed. ECF Nos. 12 and 13-13.

[5] On November 18, 2019, Fields amended its Proof of Claim to include a statement of damages sought on its fraud claim for a total of $7,888.25. In addition to the $4,638.25 secured portion of the claim, Fields asserts Debtor owes Fields $450.00 for actual damages for two tow truck fees and "kill switch operation" (both of which were incurred by Fields as a result of violations of the stay), $1,800.00 for attorney fees, and $1,000.00 for punitive damages.

[6] At the outset of the Evidentiary Hearing, Fields moved for a continuance. Creditor's Counsel stated that his main witness had broken her ankle a few weeks prior and informed Counsel the day prior that she could not appear at the Evidentiary Hearing. Debtor's Counsel opposed the continuance, and the Court denied the motion to continue.

Near the end of the Evidentiary Hearing, Fields orally moved to dismiss the case, pursuant to Rule 7052 and Rule 9014. Fields asserted that there was no direct evidence that Fields had knowledge of Debtor's bankruptcy case, and the Court denied the motion.

[7] Fields objected to the attorney's fees, asserting that the case was improperly brought as an adversary proceeding instead of a motion for turnover. The fact

the parties on the Application for Compensation on December 19, 2019. ECF No. 27.

## FACTS

This case reflects egregious and contumacious violations of the automatic stay by a creditor that either badly misjudged the consequences of its actions, or does not care. Its actions demonstrate a disdain for the financially vulnerable customers it purports to serve and an utter disregard for the automatic stay. The record and testimony presented at the Evidentiary Hearing established the following facts.

Fields is an automobile dealership that does business at 335 Fields Drive, Aberdeen, NC 28315.[8]  On August 2, 2019, Debtor purchased the Vehicle from Fields[9] by making a $790 cash down payment, borrowing the balance of the purchase price with annual

---

that the Debtor initially brought this case as an adversary proceeding is of little consequence to the determination of damages.

[8] Debtor executed the Loan Agreement with Fields and the Simple Interest Retail Installment Contract with Quality Auto of Aberdeen. Fields conceded at the initial hearing in the adversary proceeding that it activated the kill switch and repossessed the vehicle, and filed the Proof of Claim in its name.

[9] The purchase price is entirely unclear from the record and Fields' proof of claim. According to the Federal Truth in Lending Disclosures attached to the claim, the total sale price of the Vehicle was $6,564.94. Claim No. 3-2, pt. 2, p. 1. The Bill of Sale reflects a purchase price of $4,825 plus a "Dealer Service Fee" of $350, and a balance due after receipt of the down payment of $4,638.25. Id., p. 2. The original proof of claim asserted a claim for the unpaid balance in this amount. Claim 3-1. The amended claim asserts additional damages of $450 for 2 tow truck fees, which presumably occurred post-petition in violation of the stay or as a result of the Court ordering return of the wrongfully repossessed Vehicle, and "kill switch operation," which also presumably occurred post-petition in violation of the stay. In addition, the amended claim asserts $1,800 for attorneys' fees that are not detailed, and $1,000 for punitive damages due to Debtor's alleged fraud.

7

interest at 29%, and granting Fields a security interest in the Vehicle. Trial Ex. E.[10] Debtor took possession of the Vehicle that day. Fields installed a "disabling device" or "kill switch device" on the Vehicle. The kill switch allows Fields to disable the Vehicle remotely and prevent it from starting.[11] ECF No. 10.

Counsel for Fields initially contended that Debtor never made any payment toward the Vehicle, including the down payment, and Fields continued to deny that Debtor made any down payment in its Answer and Counterclaim filed with this Court and signed by counsel under Fed. R. Bankr. Pro. 9011. See ECF No. 13-16 p. 2, ¶ 5.[12] When Debtor was able to produce a copy of the payment receipt

---

[10] In its proof of claim, Fields alleges that the value of the Vehicle is $4,638.25. Claim No. 3-2. According to NADA, the average trade in value of the Vehicle is $2,050, and the average clean retail is $4,350, without any mileage adjustment. The contract documents reflect "EXEMPT" in each place for mileage, and no mileage evidence was offered by either party. See N.C. Gen. Stat. § 20-347(d)(3) (exempting vehicles that are 10 years old or older from mileage disclosure requirements). The boxes for mileage on the Certificate of Title are blank.

[11] The loan agreement contained the following language regarding the kill switch:

> 4. You are given a two (2) day grace period after payment due date. If payment is not received on the 3rd of the month by the end of business day there will be a 5% late charge. If payment is not made by the end of business day (5pm) on the 4th vehicle will be cut off until payment is received. If your vehicle is cut off you will be charged a $50.00** reconnect fee along with your monthly payment and/or late fee.

Claim No. 3-1, Part 2. Therefore, Fields could not have activated the kill switch under the terms of the contract until 5:00 p.m. on September 4. Debtor filed her petition four and a half hours earlier, at 12:29 p.m. on September 4. The record is unclear whether Debtor attempted to drive the Vehicle on September 4 or 5.

[12] Substantially contemporaneous with this Memorandum Opinion, the Court will issue its Order directing Creditor's Counsel to show cause why he should not be sanctioned under Rule 9011 for failure to conduct an inquiry reasonable under the circumstances into this written submission to the Court.

issued by Fields at the Evidentiary Hearing, Fields conceded that Debtor made the $790 down payment.

After missing the first car payment on September 1, Debtor filed for bankruptcy on September 4, 2019.  ECF No. 1.  When Debtor got into her Vehicle on September 6 and turned the key, the car failed to start because Fields had activated the kill switch. Fields sent a representative, a "repo man," to retrieve it. Fields' repossession attempt failed, however, because Debtor was physically inside of the Vehicle and refused to surrender the Vehicle.  Debtor informed the representative that she had filed bankruptcy.  Soon after, Debtor phoned her attorney to alert her to the situation.

That day, Debtor, Debtor's Counsel, and her staff repeatedly attempted to contact Fields, some communications successful and some not.  After the repossession agent came to her home, Debtor telephoned Fields and informed them of her bankruptcy filing. Despite this information, the receptionist who answered the phone at Fields directed Debtor to pay the full amount owed on the Vehicle, otherwise they would repossess and sell the Vehicle.

Later that day, Debtor stopped by her attorney's office.  Ms. Talley, legal assistant to Debtor's Counsel, called Fields and spoke with a representative who identified himself as "Joe."  Ms. Talley informed Fields of the chapter 13 case and requested that Fields deactivate the kill switch.  Ms. Talley notified Fields

that Debtor was currently in bankruptcy, provided Debtor's case number, and directed Fields to rectify the situation immediately. Despite being fully informed of the bankruptcy filing, Joe refused to deactivate the kill switch.   In fact, Joe stated that Fields was going to repossess the vehicle and abruptly hung up the phone on her.   Ms. Talley then emailed Debtor's counsel informing her of this conversation.   In response, Debtor's Counsel attempted to send Fields a fax notifying Fields of the bankruptcy case and requesting that Fields release its control of the Vehicle.

On September 9, another legal assistant to Debtor's Counsel called Fields again and informed them again that Debtor had filed bankruptcy, but the representative on the phone advised her that no one was available to speak with her regarding this issue.   In the morning, Debtor's Counsel discovered that her fax sent on September 6 failed to successfully transmit, so she mailed a letter to Fields at 335 Fields Dr., Aberdeen, NC 28315, the address listed for Fields on the North Carolina Secretary of State's website.[13] The next day, Debtor's counsel's office again attempted to call Fields twice, but no one was available to take the call.[14]

---

[13] Fields has not alleged that the notice address is incorrect.   On October 10, 2019, Fields filed its amended Proof of Claim, listing this address as the address to which notices should be sent.   Claim No. 3-2.

[14] The record is unclear whether anyone answered the phone at Fields during these two attempts, or Fields answered but again indicated that no one was available to speak to her about the case.

Despite the multiple communications that Debtor was in bankruptcy, Fields not only refused to release the kill switch, but also repossessed the Vehicle on September 11 while Debtor was in the hospital.[15]  After she was released from the hospital and discovered that her Vehicle was missing, Debtor immediately called her attorney.  She then went to Fields and spoke with a woman named Molly, who acknowledged the repossession and again told Debtor that she needed to pay the full amount to retrieve the Vehicle.  According to Debtor, when she requested her Vehicle be returned and told Molly about her bankruptcy case, Molly shrugged her shoulders and asked Debtor, "What am I supposed to do about it?"

Ms. Talley telephoned Fields again on September 12.  At first, her call went to a voicemail that indicated that no one was available to take her call.  Later that day, Ms. Talley spoke to a receptionist at Fields.  Over the phone, Ms. Talley identified herself, again provided Debtor's bankruptcy case number, and informed the receptionist that Debtor had filed for bankruptcy protection and requested that the Vehicle be returned.  The receptionist advised her that a woman named Molly at the vehicle department was not available by phone because she was at a conference in Charlotte.  The receptionist gave Ms. Talley the

---

[15] After Fields repossessed the Vehicle, Debtor permitted her insurance policy to lapse because she did not believe Fields would return the Vehicle.  However, prior to the repossession and after the Court's order on October 3, the Debtor had insurance on her Vehicle.

contact information for Fields' attorney, Clark Campbell, the first time Fields provided a purported attorney contact. Ms. Talley then called Mr. Campbell, informing him that Fields had provided his name and indicated that he represents Fields. Ms. Talley provided him with Debtor's bankruptcy case number. Mr. Campbell stated that he did not know whether he represented Fields, but said he would look into the issue and call her back. When he failed to return her call, Ms. Talley called Mr. Campbell again on September 13 and left a message. Mr. Campbell never returned Ms. Talley's call.

Debtor's Counsel then sent another fax to Fields on September 12 that successfully transmitted. In the fax, Debtor's Counsel again cautioned Fields that repossession and retention of the Vehicle was a violation of the automatic stay. The fax also warned Fields that Debtor would commence an adversary proceeding seeking the turnover of the Vehicle and sanctions for a willful violation of the stay if Fields did not return the Vehicle and release the kill switch before September 13, 2019. At some point after its repossession of the Vehicle, Fields permitted Debtor to retrieve her personal property from inside the Vehicle, which included prescription medication, tools, movies, and music, but continued to refuse to surrender the vehicle.

On September 19, Frances Bumgarner, the chapter 13 standing trustee's legal assistant, called Fields. The woman on the phone

12

stated that she had not received notice of Debtor's bankruptcy. She further stated that the person to whom Ms. Bumgarner needed to speak, Ron Jackson, was not in, but she would give him a message. Ms. Bumgarner provided her phone number, the case number, and asked the woman to let Mr. Jackson know that a staff attorney from the Trustee's office had asked her to call Fields to inform them that the automatic stay prohibits Fields from selling the Vehicle and that there would likely be a motion for sanctions. Ms. Bumgarner confirmed the following facts with the woman on the phone: (1) Fields' address, which matched the notice address; (2) that there had been no mail returned; and (3) that Fields' attorney was Mr. Campbell. The woman said she could not discuss this matter with Ms. Bumgarner, and that Ms. Bumgarner would need to talk to their attorney, Mr. Campbell. No one at Fields called Ms. Bumgarner thereafter.

Ms. Bumgarner then called Mr. Campbell. She told him about the bankruptcy case and provided Debtor's case number. The phone call was cut short when Mr. Campbell said "he understood" and abruptly hung up on her. On September 20, Mr. Campbell finally emailed Debtor's Counsel informing her that Fields had transferred representation and retained Mr. Kremer as counsel.

On September 26, Ms. Bumgarner spoke with Creditor's Counsel, who stated he had not yet reviewed any emails from Debtor's Counsel. He informed Ms. Bumgarner that Fields had not retained

13

him yet, and he was not sure if he was even going to take the case.
Ms. Bumgarner provided him with information about the case, but
Creditor's Counsel wanted to contact Debtor's Counsel and review
her emails.  More than 22 days after Debtor filed her Petition,
Fields still stubbornly refused to return the Vehicle repossessed
in violation of the automatic stay.  Debtor's Counsel commenced
the adversary proceeding, and served Fields with the Summons and
Complaint on September 17, 2019 under Fed. R. Bankr. Pro. 7004,
with a courtesy copy to Mr. Clark Campbell by United States Mail,
first class postage paid.  ECF Nos. 13-2.  On September 20, Debtor
also served Fields with a copy of the Court's Order expediting the
hearing on the motion for turnover, with a courtesy copy by
electronic mail to Mr. Kremer.  ECF No. 13-9.  The case came before
the Court for hearing on Debtor's emergency motion for turnover in
the adversary proceeding on October 3, at which time Fields still
had refused to return the wrongfully repossessed Vehicle.

**ANALYSIS**

**I.   Violation of the Automatic Stay**

On the filing of a bankruptcy petition, section 362(a) comes
into effect and prohibits, among other things, "any act to obtain
possession of property of the estate or of property from the estate
or to exercise control over property of the estate."  11 U.S.C. §
362(a)(3).  The automatic stay is one of the most fundamental and
important protections given to debtors under the Bankruptcy Code.

14

See In re Barrow, 2015 WL 1545684, at *3 (Bankr. E.D.N.C. Mar. 31, 2015); In re Wright, 608 B.R. 648, 652 (Bankr. W.D. Va. 2019)("The automatic stay is a bedrock principle upon which the Code is built; the importance of § 362 cannot be over-emphasized.")(citations and internal quotation marks omitted).

Section 362(k)(1) provides that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."   11 U.S.C. § 362(k)(1).   To impose sanctions for a violation of the automatic stay, the injured party must show that (1) the conduct constituted a violation of the automatic stay; (2) the creditor's violation of the automatic stay was willful; (3) that the debtor was injured as a result of the violation.   In re Sauls, 2012 WL 1224379, at *2 (Bankr. M.D.N.C. Apr. 11, 2012)(citing Hamrick v. U.S. (In re Hamrick), 175 B.R. 890, 893 (Bankr. W.D.N.C. 1994); Foreston Coal Int'l. Inc. v. Red Ash Coal & Coke Corp. (In re Red Ash Coal & Coke Corp.), 83 B.R. 399, 403 (W.D. Va. 1988)).   To demonstrate there was a willful violation of the stay, the debtor must establish that the party knew of the bankruptcy filing and then took some intentional action.   Better Homes, 804 F.2d at 292-3 (finding a willful violation of the stay occurred when the creditor "knew of the pending petition and intentionally attempted to repossess the vehicles in spite of it."); Clayton v. King (In

15

re Clayton), 235 B.R. 801, 807 (Bankr. M.D.N.C. 1998); In re
Sharon, 200 B.R. 181, 200 (Bankr. S.D. Ohio 1996).  In requesting
sanctions § 362(k), the debtor bears the burden of proof by
preponderance of the evidence.  11 U.S.C. § 362(g)(1); In re
Johnson, 501 F.3d 1163, 1172 (10th Cir. 2007); Clayton, 235 B.R.
at 806.[16]

    The evidence presented in this case established that Fields'
refusal to surrender possession of the Vehicle, post-petition
demand for payment, and continued control of the Vehicle for weeks
with knowledge of the bankruptcy, constitute willful violations of
the automatic stay.  For the reasons set forth below, the Court
finds that the Debtor has met her burden and is entitled to actual
and punitive damages against Fields.

**A. Fields had actual knowledge and notice of the Debtor's
bankruptcy case and willfully violated the automatic stay.**

    Fields does not contest that it violated the automatic stay
when it repossessed Debtor's Vehicle, but asserts that it did not
have proper notice and any violation was merely technical.  It is
undisputed that the Vehicle was property of the estate.  Fields'
conduct in exercising control over the Vehicle through the kill

---

[16] As the court in In re Houck noted, courts are split on the proper standard
of evidence to be used in a § 362(k) action.  597 B.R. 820, 831 n. 5 (Bankr.
W.D.N.C. 2019).  In the past, this district has applied a preponderance of the
evidence standard, rather than a clear and convincing standard.  See Clayton,
235 B.R. at 806 n. 2.  In this case, the evidence of Fields' willful violation
of the stay is overwhelming and unrebutted.  Therefore, Debtor has met her
burden regardless of the standard applied.

switch, demanding payment of a pre-petition debt in order to release the Vehicle, and repossessing the Vehicle post-petition each violated the automatic stay.  See 11 U.S.C. §§ 362(a)(3), (4), and (6).  The Debtor argues that she does not need to prove that Fields specifically intended to violate the stay.  Moreover, although Fields may not have known about the automatic stay when it initially disabled the Vehicle, Fields was aware of the bankruptcy filing when it refused to release the kill switch, repossessed the Vehicle, demanded payment of the pre-petition obligation, and refused to return the Vehicle for almost a month until it was ordered to do so by this Court.  Despite the unrebutted testimony in this case, Fields argues that there is no direct evidence that it knew about the bankruptcy, and as such, its actions were not intentional or willful, constituting only a technical violation of the stay.

Fields' argument wholly lacks merit.  Fields was fully aware of the bankruptcy filing no later than the day of its first attempt to repossess the Vehicle post-petition, and was repeatedly told about the bankruptcy by at least five people between September 6 and September 12, 2019.  First, Debtor and Ms. Talley notified Fields of the bankruptcy filing in person[17] and by telephone on September 6, the date Fields activated the kill switch and two

---

[17] In re Adams, 516 B.R. 361, 368 (Bankr. S.D. Miss. 2014) (holding that oral notice to a repossession agent is imputed to the creditor).

days after Debtor filed her Petition.  See In re Walters, 219 B.R. 520, 526 (Bankr. W.D. Ark. 1998) ("Being advised of the filing of a bankruptcy case *in any form* places a creditor on notice of the bankruptcy filing.  Upon being advised, even informally by telephone, of the bankruptcy case, the creditor is on notice of the bankruptcy.  The creditor has an affirmative duty to ascertain the correctness of the information or advice; it may not disregard information of the bankruptcy case.")(emphasis in original). During her phone call with Fields that day, Ms. Talley further advised Fields of the chapter 13 case and provided Debtor's case number.  Debtor's counsel's office thereafter spoke with Fields again by telephone on September 9 and 11, and provided the filing information.  Despite these notifications, the Fields representative, stated Fields was "not going to turn it back on" and "was going to repossess it."  On September 12, Debtor's Counsel sent Fields a letter and again called Fields, explaining the bankruptcy and the automatic stay.  Fields did not respond to any of these communications, and, in fact, repossessed the Vehicle on September 11 while Debtor was in the hospital and after Fields had been told on at least four separate occasions about the bankruptcy filing.

Fields not only had actual knowledge of the case immediately after its filing, but the Bankruptcy Noticing Center also served Fields with formal notice on September 7.  ECF No. 9.  "Proof that

18

a letter properly directed was placed in a post office creates a presumption that it reached its destination in usual time and was actually received by the person to whom it was addressed." <u>Hagner v. United States</u>, 285 U.S. 427, 430 (1932); <u>see also Collier on Bankruptcy</u> ¶ 9006.11 (16th Ed. 2014) (noting that courts have held that "Rule 9006(e) creates a rebuttable presumption that the paper mailed was received by the party to whom it was sent"). "This presumption may only be overcome by evidence that the mailing was not actually accomplished and the mere denial of receipt is insufficient." <u>In re Warren</u>, 532 B.R. 655, 662 (Bankr. D.S.C. 2015).

Fields failed to rebut the presumption that it received formal notice of the bankruptcy case. The BNC sent notice of the Debtor's bankruptcy to Fields' correct business address. Fields presented no evidence to the contrary, either through testimony or written documentation, that the bankruptcy notices were improperly addressed, returned as undeliverable, or not received. In fact, the notices were sent to the notice address provided by Fields on its proof of claim. As such, the BNC provided Fields with formal notice that future actions with regards to the Vehicle were stayed and that it could be penalized if it attempted to repossess the car or take other action in violation of the Bankruptcy Code.

Accordingly, Fields had formal notice of the bankruptcy case soon after September 7.[18]

Having determined that Fields had actual knowledge and notice of the bankruptcy no later than September 6, the Court must determine whether Fields willfully violated the stay despite such notice. It did. Although Fields' activation of the kill switch sometime between September 4 and 6 may have been done without knowledge of the bankruptcy and therefore constituted only a technical violation of the stay, by thereafter refusing to deactivate the kill switch, repossessing the vehicle, demanding payment of the pre-petition obligation, and continuing to possess the Vehicle—all with full knowledge of the bankruptcy—Fields willfully, recalcitrantly, and repeatedly violated the stay. Once a creditor has been notified of the bankruptcy filing, "a creditor must act *immediately* to restore the *status quo* once it learns that it has violated the automatic stay." In re Holman, 92 B.R. 764, 769 (Bankr. S.D. Ohio 1988)(collecting cases)(emphasis in original); In re Stephen W. Grosse, P.C., 68 B.R. 847, 850 (Bankr.

---

[18] Although the exact moment Fields received formal notice of the stay is uncertain, the Court need not determine the precise time because the sequence of events in this case reflects it had actual knowledge of the case no later than September 6. Although, Fields activated the kill-switch immediately after Debtor filed her Petition on September 4, and therefore may have been unaware of the filing at that time, the activation nonetheless occurred post-petition and therefore violated the stay. When Fields learned of the filing no later than September 6, it still refused to release the switch, and thereafter, demanded payment, repossessed the Vehicle, and continued to possess the Vehicle for weeks.

E.D. Pa. 1987)(A "creditor should undo its postpetition collection activities without the debtor having to seek affirmative relief from [the] bankruptcy court").

Contrary to Fields' argument, the Debtor does not need to show that the creditor had the specific intent to violate the stay. In re Alt. Bus. and Cmty. Corp., 901 F.2d 325, 329 (9th Cir. 1990)(citing In re Bloom, 875 F.2d 224, 227 (9th Cir. 1989)). It is sufficient to demonstrate that the party knew the bankruptcy case existed and that the creditor's actions were intentional. Id.; Budget Serv. Co. v. Better Homes of Virginia, Inc., 804 F.2d 289, 292-93 (4th Cir. 1986) ("[W]e conclude that [§ 362(k)] sanctions were properly assessed against [the creditor] for a willful violation of the automatic stay. There is ample evidence in the record to support the conclusion that [the creditor] knew of the pending petition and intentionally attempted to repossess the vehicles in spite of it.");[19] see also Hamrick, 175 B.R. at

---

[19] In Taggart v. Lorenzen, ___ U.S. ___, 139 S.Ct. 1795, 1802 (2019), the Court determined that mere knowledge of the discharge order and the undertaking of an intentional act in violation of the discharge injunction were insufficient to establish contempt under §§ 105(a) and 524. Nevertheless, a creditor's subjective belief that its conduct was not contemptuous will not shield it from liability if that belief was not objectively reasonable. Id. Therefore, a creditor will not be liable for contempt of the discharge injunction if it were "objectively reasonable" for a creditor to believe that such actions did not violate the court's order. Id. In so holding, the Court expressly recognized the difference between the standards for imposing sanctions for a contemptuous violation of the discharge injunction under §§ 105(a) and 524 and imposing sanctions for a willful violation of the stay under § 362(k). Id. at 1803-04 (distinguishing the language between these sections, noting the fundamental purposes of the stay and the finite period for which it is in place as compared to the permanent discharge injunction, and declining to determine the standard necessary to establish "willfulness" for purposes of § 362(k)). For these reasons, the Court in Taggart expressly did not reverse the prior settled law

892 (stating that a willful violation has occurred when "[t]here is ample evidence in the record to support the conclusion that [the creditor] knew of the pending petition and intentionally attempted to [continue collection procedures] in spite of it.")(quoting Budget Serv. Co, 804 F.2d at 292-93).

The evidence demonstrated that Fields intentionally refused to deactivate the Vehicle's kill switch that had been activated post-petition, demanded payment of a pre-petition debt, and retained the Vehicle, all in violation of the automatic stay and with full knowledge of the bankruptcy filing.

**B. The Debtor suffered injury as a result of Fields' violation of the automatic stay.**

Having determined that Fields willfully violated the automatic stay, the Court now examines whether the Debtor "suffered some compensable injury as a result of the violation." In re Preston, 333 B.R. 346, 350 (Bankr. M.D.N.C. 2005). An injury "is generally defined as a 'violation of another's legal right.'" In re Drake, 2015 WL 393408, at *4 (Bankr. M.D.N.C. Jan. 6, 2015)(citing Preston, 333 B.R. at 350; In re Johnston, 362 B.R. 730, 740 (Bankr. N.D.W. Va. 2007)).

---

enunciated by the Fourth Circuit in cases such as Budget Serv. Co., and courts should not extrapolate from Supreme Court opinions in a manner that is inconsistent with settled circuit law.  See Bakst v. Smokemist, Inc. (In re Gladstone), 513 B.R. 149, 160 (Bankr. S.D. Fla. 2014) (citing McNeal v. GMAC Mortg., LLC (In re McNeal), 735 F.3d 1263, 1265-66 (11th Cir. 2012)).  Even if the standard in Taggart applied to § 362(k), no reasonable creditor objectively could have believed Fields' actions in this case did not violate the automatic stay.

At the Evidentiary Hearing, Debtor testified that the Vehicle was her only means of transportation for herself and two grandchildren of whom she has custody. As a result of the deprivation of her Vehicle in violation of the automatic stay, Debtor paid people to transport her and her grandchildren to doctor appointments and grocery stores at a cost of $150.00.

Debtor suffered additional, but unquantified injury. Despite Fields' argument that the Vehicle is not essential to Debtor,[20] Fields' repossession and continued retention of the vehicle deprived Debtor of her sole means of transportation for nearly a month and forced her to incur expenses in the form of paying for other transportation. Fields retained the Vehicle for approximately 28 days, and each day it continued to possess the car, Fields engaged in further violation of the stay, and deprived Debtor of the value of its use. See Adams, 516 B.R. at 370 (awarding actual damages for loss of use of a vehicle where the debtor offered testimony about the cost of a rental). Despite

---

[20] At the Evidentiary Hearing, Creditor's Counsel asked Debtor about the amount of income she stated in her credit application for the Vehicle. Debtor's Counsel objected to the relevance of the question. The Court reserved ruling on the objection, but permitted Debtor to respond for the record.

The question had no relevance to the factual matters before the Court. Whether Debtor overstated her income on the credit application has no bearing on whether Fields knew about the bankruptcy filing or violated the automatic stay, nor is it relevant to the amount of any damages caused to the debtor by the violation. To the extent the question was offered solely to attack the Debtor's credibility under Fed. R. Evid. 608(b), the objection is overruled. Nevertheless, the Court finds the Debtor's testimony to be credible and largely corroborated by other witnesses and the record.

Debtor's loss of use, however, Debtor did not put on evidence of any expenses associated with renting a replacement vehicle, likely because Debtor cannot afford the cost of a rental vehicle even if such amounts were later recoverable.  Finally, Debtor was unable to regain possession until Debtor incurred the expense of filing an action and obtaining an order from the Court requiring its return.  Thus, the Court finds that Debtor has satisfied the injury requirement under § 362(k).

## II.  Damages

The Debtor requests compensatory damages, attorney's fees, and punitive damages.  "[A]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k)(1).  The Court has no discretion to withhold an award of compensatory damages, including costs and attorneys' fees, when the automatic stay is willfully violated.  In re Escobedo, 513 B.R. 605, 612-13 (Bankr. D.N.M. 2014)(noting that the award of actual damages is mandated under § 362(k)(1))(citing In re GeneSys, Inc., 273 B.R. 290, 295 (Bankr. D.D.C. 2001)).

### A. Actual Damages

Debtor seeks $150.00 for the costs she incurred for alternate transportation to court, the grocery store, and doctors'

appointments for Debtor and her grandchildren.[21]    "Courts traditionally view actual damages as a broad umbrella term, including, but not limited to, lost time damages, out-of-pocket expenses, and emotional damages." Wright, 608 B.R. at 653 (quoting In re Ojiegbe, 539 B.R. 474, 479 (Bankr. D. Md. 2015) (internal quotations omitted)).    Debtor was without the Vehicle, her sole means of transportation, for weeks, and it is likely that her damages well exceed the $150.00 paid for essential transportation during that time.    Nevertheless, there is insufficient evidence to quantify any further compensatory damages outside of these expenses and Debtor's costs and attorneys' fees.

## B. Costs and Attorney's Fees

Debtor's Counsel submitted the Application for Compensation detailing the fees and costs incurred by Debtor in connection with the action filed against Fields.    ECF No. 16.    Section 362(k)(1) permits recovery of reasonable costs and attorneys' fees as components of Debtor's actual damages.    See In re Miller, 447 B.R. 425, 434 (Bankr. E.D. Pa. 2011) ("For Debtors to recover attorneys' fees, however, such fees must be reasonable and necessary.").    As reflected and itemized in the Application for Compensation, Debtor

---

[21] Generally, Debtors may recover emotional distress damages under § 362(k). In re Dawson, 390 F.3d 1139 (9th Cir. 2004)(overruled on other grounds); Mercer v. D.E.F., Inc., 48 B.R. 562 (Bankr. D. Minn. 1985); In re Pody, 42 B.R. 570 (Bankr. N.D. Ala. 1984).    While Debtor indicated at the Evidentiary Hearing that being without her Vehicle caused her stress, the Debtor did not request emotional damages in her prayer for relief or provide any further evidence of emotional damages.

incurred attorneys' fees in the total amount of $3,754.00 and costs in the amount of $59.90 in connection with this matter up through the Evidentiary Hearing.   ECF No. 16.   On December 16, the Bankruptcy Administrator ("BA") filed a limited objection to the Application for Compensation.   ECF No. 26.   The BA agreed that the time and hourly rate was fair but objected because the hourly travel rate was billed at a full hourly rate, instead of half the hourly rate, as is customary in this district for fees to be paid by the bankruptcy estate.   The BA recommended the Application for Compensation be reduced by $300.00 and allowed for a total amount of $3,513.90.   At the hearing on the Application for Compensation, Fields did not contest the reasonableness of the fees, but merely argued that fees should not be awarded against Fields because its actions were only technical stay violations.   The Court has reviewed the itemized application filed by Debtor's Counsel, and finds that the attorney's fees and costs associated with the prosecution of this contested matter as billed in the amount of $3,754.00 are reasonable for the services provided.   The total hours spent, total amount billed, and rates are consistent with the practice in this district, the issues involved in this case, and counsel's experience.   Because these fees will not be borne by the estate, any reduction for travel time is unnecessary in the Court's discretion.   Therefore, Debtor's attorneys' fees in the amount of $3,754.00 and costs of $59.90 constitute additional

damages caused by Fields' willful violations of the automatic stay and will be awarded in favor of Debtor.

### C. Punitive Damages

Under § 362(k), an award of punitive damages is within the discretion of the court. In re Clayton, 235 B.R. at 811 (citing Davis v. IRS, 136 B.R. 414, 424 (E.D. Va. 1992)). Courts award punitive damages where a party's misconduct is egregious, vindictive, or intentional. Davis, 136 B.R. at 424 (citing In re Ketelsen, 880 F.2d 990, 993 (8th Cir. 1989)); In re McHenry, 179 B.R. 165, 168 (9th Cir. B.A.P. 1995). Courts additionally have held that punitive damages are appropriate when a creditor acted with "actual knowledge" that it was "violating [a] federally protected right or with reckless disregard of whether he was doing so." Wells Fargo Bank, N.A. v. Jones, 391 B.R. 577, 608 (Bankr. E.D. La. 2008) (internal quotation marks and citations omitted).

Fields' conduct in this case was egregious sand warrants punitive damages. Fields' conduct in this case was egregious. Fields not only refused to comply after being repeatedly notified of the bankruptcy filing, but was obdurate and dismissive to Debtor, Debtor's counsel, and the standing trustee. Fields failed to return calls, provided false information about representation of counsel, demanded payment of a pre-petition claim in order to comply with its unconditional obligations under the United States Bankruptcy Code, asserted non-payment of amounts actually paid by

Debtor despite having evidence that Debtor actually made such payments, and intentionally gave Debtor and the Trustee "the run around" for almost a month. Fields has shown no remorse for its actions, continuing to argue that it, at most, committed only a technical violation of the stay despite all the evidence to the contrary. Fields requested and obtained a continuance of the first scheduled evidentiary hearing only to request a further continuance at the commencement of the continued hearing because its witness did not appear. Its actions demonstrate a callous disregard for the automatic stay and this Court. As such, the Court will impose punitive damages.

When determining the appropriate amount of punitive damages, courts "aim at 'deterrence and retribution.'" Charity v. NC Fin'l Solutions of Utah, LLC (In re Charity), Case No. 16-31974-KLP, Adv. P. No. 16-03121-KLP, 2017 WL 3580173, at *18 (Bankr. E.D. Va. August 15, 2017) (quoting Saunders v. Equifax Info. Servs., L.L.C., 469 F.Supp.2d 343, 348 (E.D. Va. 2007), aff'd sub nom. Sanders v. Branch Banking & Trust Co. of Va., 526 F.3d 142 (4th Cir. 2008)). In taking aim at these purposes, courts should consider "three guideposts": (1) "the degree of reprehensibility" of the creditor's conduct; (2) "the ratio between punitive and compensatory damages"; and (3) the amount of punitive damages awarded in other comparable cases as compared to the actual damages suffered in such cases. Charity, 2017 WL 3580173, at *18. The

reprehensibility of the creditor's conduct is assessed in light of evidence of the creditor's "'indifference to or [] reckless disregard' for the rights of others, whether the target of the conduct was financially vulnerable and whether the conduct involved repeated actions." Id. at *19 (quoting State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 418 (2003)).  Where actual damages are low, the ratio of actual damages to punitive damages "has less significance" because a simple multiple of actual damages "'would utterly fail to serve the traditional purposes underlying an award of punitive damages, which are to punish and deter.'"  Id.  (quoting Saunders, 526 F.3d at 154).  The amount awarded should deter both the creditor and others, and should motivate the creditor "to devote the resources necessary to correct the deficiencies in its bankruptcy procedures." Id. at *20.

Fields conduct was repetitive and reprehensible by any measure.  The blithe and callous phlegm of the repeated notifications and warnings from Debtor, Debtor's counsel, and the Trustee's office, combined with Fields' total disregard for the strictures of the automatic stay in this case is remarkable. Fields has shown no contrition, remorse, or comprehension of the severity of its actions.  This lack of contrition "portends that similar violations will continue" in the absence of sufficient deterrence.  Charity, at *19 n.66.  Debtor is financially vulnerable, and Fields treated her as someone with no recourse to

the courts, a gamble that likely pays off for Fields in its usual interactions with financially vulnerable customers. Debtor has health issues, physical limitations, cares for two teenage grandchildren, and struggles with very little household income.[22] Fields preyed on her vulnerability and repossessed her Vehicle while she was in the hospital and in bankruptcy. Therefore, the first "guidepost" justifies significant punitive damages in this case.

Because the amount of actual damages is necessarily low, given the value of the Vehicle at issue and Debtor's meager financial means, the Court finds that the use of any multiple of actual damages would be meaningless and would utterly fail to serve the purposes for imposing punitive damages. Therefore, although the Court has considered the amount of actual damages, including attorneys' fees caused by Fields' conduct, the Court has given this guidepost less weight.

In applying the final guidepost provided by the Supreme Court, other courts have awarded significant punitive damages in cases with similarly small actual damages when circumstances demonstrate that creditors "simply ignored the automatic stay." See In re Johnson, 2016 WL 659020, at *5 (Bankr. W.D.N.C. Feb. 17, 2016)

---

[22] Debtor is unemployed. Her total monthly income is $1,262, consisting of social security in the amount of $771, food stamps of $309, and a "stipend for grandchildren" of $181. Debtor's housing is subsidized in its entirety. ECF No. 1, pp. 32-3, Schedule I.

(awarding $300.00 in actual damages for travel to and from court, $3,297.23 for legal fees, and $54,000 in punitive damages), vacated on other grounds by consent as a result of settlement, Case No. 15-550053, ECF No. 15 (Bankr. W.D.N.C. June 10, 2016) (reducing total damages to $46,700). Punitive damages assessed by other courts vary significantly. See In re Randle, 2018 WL 4211158, at *3 (Bankr. M.D.N.C. Sept. 4, 2018) (awarding $25,000 in punitive damages when the creditor repossessed the vehicle post-petition and failed to return it for over eight months with "disdain and willful disregard for the automatic stay"); Warren, 532 B.R. at 667 (awarding $11,596.96, comprised of $546.96 for loss of use of the Vehicle and improperly required payments, $500 for pain and suffering, $8,200 in attorneys' fees, and $2,000 in punitive damages when creditor repossessed the vehicle and delayed return after receiving notice of the bankruptcy filing for only four days); Adams, 516 B.R. at 375-76 (awarding punitive damages of $6,600.00 when the creditor had notice of the automatic stay and repossessed the debtors' vehicle and held it for 25 days despite repeated requests for its return); Bishop v. U.S. Bank (In re Bishop), 296 B.R. 890, 899 (Bankr. S.D. Ga. 2003) (awarding $6,306.84 in actual damages and $50,000 in punitive damages where creditor engaged in reprehensible conduct, including harassing the debtor and repossessing the vehicle post-petition with knowledge of the bankruptcy case); In re Meeks, 260 B.R. 46 (Bankr. M.D.

31

Fla. 2000) (awarding $479.35 in actual damages and $35,000 in punitive damages and cancelling creditor's claim where creditor repossessed vehicle post-petition with knowledge of the bankruptcy filing); In re Cepero, 226 B.R. 595 (Bankr. S.D. Oh. 1998) (awarding $1,832.40 in actual damages and $12,000 in punitive damages where creditor repossessed debtor's vehicle post-petition despite debtor's counsel leaving a voicemail for the creditor informing creditor of the bankruptcy filing); In re Stephens, 495 B.R. 608, 617 (Bankr. N.D. Ga. 2013) (awarding $17,890 in punitive damages where the creditor repossessed the debtor's vehicle pre-petition, had notice of the automatic stay, and later refused to return the vehicle and later sold it, causing actual damages of $1,559 plus attorneys' fees of $4,325); In re Velichko, 473 B.R. 64 (Bankr. S.D.N.Y. 2012) (determining debtors were entitled to compensatory damages for rental car, attorney's fees, repayment of arrears, and punitive damages equal to amount of compensatory damages where creditor willfully violated the automatic stay in refusing to return the motor vehicle it had repossessed pre-petition promptly after creditor had been notified of the bankruptcy case, and instead insisting that Debtors cure their arrearage prior to possession); Sauls, 2012 WL 1224379, at *4-5 (awarding $2,630 in attorneys' fees and $3,500.00 in punitive damages when creditor, who received telephonic notice, service by mail of court documents evidencing the filing, and actual notice

from debtor, refused to return the car for over 30 days in violation of the automatic stay); Taylor v. Credit Cars of Lexington, 2010 WL 5437244, at *3 (Bankr. D.S.C. 2010) (awarding $5,000.00 in punitive damages as a result of creditor's knowing and willful vehicle repossession in violation of § 362); In re Patterson, 263 B.R. 82 (Bankr. E.D. Pa. 2001) (awarding punitive damages in the amount of $4,500 where creditor repossessed the vehicle post-petition despite telephonic notice of the bankruptcy filing).

In the cases above in which creditors wrongfully retained vehicles post-petition, the sanctions vary among $25,000 (or $105 per day) in Randle, $3,500 (or $116 per day) in Sauls, $6,600 (or $264 per day) in Adams, and $2,000 (or $500 per day) in Warren. Unlike in this case, in Sauls, the creditor repossessed the vehicle pre-petition, but refused to return it, thereby making its conduct less egregious than Fields' conduct in this case. In Randle, the vehicle was a Cadillac Escalade and the actual damages were more significant, rendering a ratio to actual damages a more meaningful guidepost. Nevertheless, the creditor's actions in Randle were analogous to this case. See Randle, 2018 WL 4211158, *2. Furthermore, although the creditor in Randle never returned the vehicle, the debtors did not seek any hearing and ultimately did not seek turnover by the time the matter first came before the court on a motion for default judgment eight months after the

33

petition date.  Id. at *3.  In considering these cases and the egregiousness of Fields' actions, the Court finds that the appropriate amount of punitive damages for Fields's retention of the Vehicle is $7,000, which amount represents $250 per day for the 28 days between September 6 and October 4.

The courts above also impose punitive damages for wrongful post-petition repossession and post-petition demands for payment.[23] Having considered Fields' conduct as set forth herein, the Court will not assess these actions by Fields in a vacuum without the context of its overall contumaciousness.  For the post-petition repossession of the Vehicle while Debtor was in the hospital after its earlier failed post-petition repossession and notification of the bankruptcy case, the Court will impose additional punitive damages of $5,000.  Fields also demanded payment post-petition on at least two occasions as a condition for return of the Vehicle.

---

[23] None of the cases cited herein considers the applicable factors and guideposts more meticulously than the court in Charity.  In that case, the court awarded damages in three separate cases.  The actual damages awarded in the three cases were $202.44, $1,155.63, and $415.25, respectively, plus substantial attorneys' fees.  The court nevertheless awarded punitive damages of $100,000 in each case. The creditor NetCredit in Charity continued to draft several ACH mortgage payments post-petition and made demands for payment despite notice of the bankruptcy filings.  In assessing $300,000 in punitive damages, the court in Charity likely considered the size of the creditor, NetCredit, and the apparent pervasiveness of the practice beyond the debtors immediately before it. Although the actions of Fields are no less egregious than the actions by NetCredit in any one of the respective cases before the court in Charity, the repetition of the violations between three cases weighs against such substantial punitive damages in this case.  Nevertheless, the actions of Fields in this case are as egregious as in any of the cases cited above, including Charity. Therefore, this factor indicates a significant punitive award is appropriate to punish Fields for its conduct and to deter Fields and others from engaging in similar conduct in the future.

Each of these demands constitutes an independent willful and egregious violation of the stay, and the Court will impose punitive damages of $1,500 for each instance. Therefore, the Court will award total punitive damages of $15,000.[24]

## Conclusion

For the reasons set forth herein, the Court concludes that Debtor is entitled to an award of damages in the amount of $150.00 incurred for her transportation, as well as the attorney's fees and costs incurred in bringing this contested matter in the amount of $3,813.90. Additionally, the Court will award punitive damages in the amount of $15,000.00. Fields shall have 14 days from the entry of the Court's Order to pay all amounts to Debtor's Counsel, and the Court will conduct a further hearing on February 13, 2020 at 9:30 a.m. EDT, at the United States Bankruptcy Court, Venable Center, Dibrell Building – Suite 280, 302 East Pettigrew Street, Durham, North Carolina 27701 to ensure compliance and to consider whether Fields should be held in contempt for any failure to timely comply. To the extent Fields does not timely comply, sanctions may include further monetary relief. The Court will enter an Order consistent with this opinion.

---

[24] The total amount of punitive damages also is approximately twice the $7,888 amount asserted in Fields' amended proof of claim. See In re Stephens, 495 B.R. 608, 617 (Bankr. N.D. Ga. 2013) (awarding $17,890.00 in punitive damages calculated at twice the scheduled debt). Where actual damages are minimal and therefore a multiple of those damages does not create a meaningful guidepost, this Court agrees with the implicit punitive purpose of a reasonable ratio to the underlying debt imposed by the court in Stephens.

[END OF DOCUMENT]

**Parties to be Served**

Evex Ross Franklin
400 Talmadge Way
Southern Pines, NC 28387

Field's Management, Inc.
Attn: Officer
335 Fields Drive
Aberdeen, NC 28315-8611

Field's Management, Inc.
By and Through its Registered Agent Michelle Jackson
335 Fields Drive
Aberdeen, NC 28315-8611

Mr. Chris A. Kremer
Kremer's House of Law
Suite 48
120 West Pennsylvania Avenue, Suite 48
Southern Pines, NC 28387

Brandi L. Richardson
Brandi L. Richardson Attorney at Law
PO Box 840
Reidsville, NC 27323

Mr. William P. Miller
Bankruptcy Administrator
101 S. Edgeworth Street
Greensboro, N.C. 27401

Richard M. Hutson
Standing Trustee
PO Box 3613
Durham, NC 27702-3613